**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA ALICIA QUINTANA, | Case No. CV 15-07826 (SS) |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Maria Alicia Quintana ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration ("the Agency," "the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is REVERSED and REMANDED for further proceedings.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Disability Insurance ("DIB") on February 2, 2012. (Administrative Record ("AR") 18). Plaintiff alleged disability beginning on April 1, 2011. (AR 160). Plaintiff's application was initially denied on April 30, 2011, and denied on reconsideration on October 31, 2012. (AR 96-99, 87-94). On November 14, 2012, Plaintiff requested a hearing before an administrative law judge. (AR 105-06). A hearing was held before Administrative Law Judge ("ALJ") Richard A. Urbin on August 8, 2013 ("the ALJ Hearing"), at which Plaintiff was represented by counsel and testified. (AR 44-47). The ALJ issued an unfavorable decision on December 13, 2013 finding that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 38-51). Plaintiff requested review of the ALJ's decision on January 6, 2014, which the Appeals Council denied on April 15, 2015. (AR 1-10). As a result, the ALJ's decision became the final decision of the Commissioner. Plaintiff filed this action on October 6, 2015.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on June 23, 1966. (AR 78). Plaintiff is married and has four children, the youngest of which was born in February 2011. (AR 50, 63). Plaintiff is a high school graduate and attended some college. (AR 50). Prior to her alleged

2

disability, Plaintiff worked as an insurance biller from 1996 to 1997, a receptionist from 1998 to 2001, an office manager from 2003 to 2005, and again as an insurance biller from 2006 to February 2011. (AR 170-74). Plaintiff identified April 1, 2011 as the onset date of her disability. (AR 78). Plaintiff testified that she suffers from depression, social anxiety, difficulty sleeping, numbness on her right side, back pain, pain in her right knee, diabetes, and high blood pressure. (AR 57-69). Plaintiff also testified that she was overweight at 207 pounds. (AR 67).

A. **Medical History And Treating Doctors' Opinions**

    **1. Physical and Mental State**

       a. Eric Fernandez, M.D. – Primary Care Physician

On June 20, 2011, Dr. Fernandez examined Plaintiff and assessed her lower back pain, knee joint pain, anxiety, insomnia, diabetes, and recurring major depression. (AR 243-44). Dr. Fernandez referred Plaintiff to physical therapy for her knee pain, instructed Plaintiff to manage her diabetes, and advised Plaintiff to continue her depression/anxiety medication. (AR 244). On July 28, 2011, Dr. Fernandez noted similar complaints from Plaintiff. (AR 243-47). Dr. Fernandez changed Plaintiff's depression medication from Wellbutrin to Celexa because Wellbutrin reportedly made Plaintiff ill. (AR 245). On December 12, 2011, Dr. Fernandez noted that Plaintiff had "eruption" of acne due to stress. (AR 251). Dr. Fernandez also addressed Plaintiff's lower back pain

1    and cautioned Plaintiff to "avoid heavy lifting" and to take pain
2    medication as directed.  (AR 251).

4         On March 30, 2012, Dr. Fernandez examined Plaintiff's x-rays
5    and found that there was a loss of the lordotic curve,[1] a possible
6    small osteophyte,[2] and possible scoliosis.[3]  (AR 257).  Plaintiff
7    also complained of intermittent numbness in her neck with spasms.
8    (AR 257).  On September 26, 2012, Dr. Fernandez noted that Plaintiff
9    was taking Xanax and Citalopram for depression/anxiety and
10   increased her dosage of Citalopram because Plaintiff was "still
11   emotional."  (AR 273).  On December 4, 2012, Dr. Fernandez noted
12   that Plaintiff started taking Cymbalta and Abilify for
13   depression/anxiety and that she was "still emotional."  (AR 301).

15        **2. Physical Health Evidence**

17             a.  Jennifer Shields – Registered Physical Therapist

19        On March 29, 2012, Plaintiff began a series of physical
20   therapy sessions with Jennifer Shields, a registered physical
21   therapist.  (AR 260-61).  Plaintiff's chief complaint was lower

_____

23   [1] Lordotic curve is the normal inward curving of the lumbar spine.
     (See "Lordosis Definition" available at http://www.spine-
24   health.com/glossary/lordosis).
25   [2] Osteophytes, common known as "bone spurs," are an enlargement of
     the spine's normal bony structure.  They are common over the age
     of 60.  (See "Bone Spurs (Osteophytes) and Back Pain," available
26   at http://www.spine-health.com/conditions/arthritis/bone-spurs-
     osteophytes-and-back-pain).
27   [3] Scoliosis is an abnormal side-to-side curvature of the spine.
     (See "Scoliosis – Symptoms, Causes, Treatments," available at
28   http://www.spine-health.com/conditions/scoliosis).

back pain, reported her pain level at "7" on a scale of one to ten. (AR 260).  Ms. Shields noted "poor" posture in both standing and seated positions.  (AR 260).  Ms. Shields recommended a six-week plan to decrease Plaintiff's pain as well as improve functioning level and posture.  (AR 261).

Plaintiff again attended physical therapy on April 10, 2012, and reported a pain level of "4-6."  (AR 284).  On April 20, 2012, Plaintiff reported a pain level of "6."  (AR 282).  On June 6, 2012, Plaintiff complained that her "neck hurts the most" and reported a pain level of "8."  (AR 281).  On August 28, 2012, Plaintiff was discharged from the physical therapy sessions.  (AR 280).  The sessions concluded with "[g]oals partially met," with Plaintiff reporting a pain level of "4."  (AR 280).

**3.  Mental Health Evidence**

a.  Mark Simonds, M.D.

Plaintiff first visited Dr. Simonds on June 13, 2013.  (AR 328-32).  Plaintiff told Dr. Simonds that she felt "somewhat socially isolated at this time."  (AR 329).  Dr. Simonds increased Plaintiff's dosage of Cymbalta and noted that she was tolerating that medication well.  (AR 331).  On the same day, Dr. Simonds filled out a "Medical Source Statement" for internal use by the Agency.  (AR 359).  Dr. Simonds indicated, via check-boxes, "[m]arkedly limited" functioning in: Plaintiff's ability to relate and interact with co-workers; her ability to deal with the public;

1  her ability to maintain concentration for two-hour increments, and;
2  her ability to withstand the stresses of typical eight-hour work
3  days.   (AR 359).   Dr. Simonds indicated "[m]oderately limited"
4  functioning in: Plaintiff's ability to carry out complex job
5  instructions; her ability to carry out simple job instructions,
6  and; her ability to handle funds.  (AR 359).

7

8      On July 24, 2013, Plaintiff reported that her mood symptoms
9  were "improving somewhat" and that she was satisfied with her new
10  Cymbalta dosage.  (AR 364).   Plaintiff told Dr. Simonds that her
11  energy and motivation were higher than before, and that she was a
12  "little less" frustrated and anxious.  (AR 364).

13

14          b.  Romeo L. Isidro, M.D.

15

16      On February, 28, 2013, Dr. Isidro, a psychiatrist, examined
17  Plaintiff.  (AR 356-57).   Dr. Isidro's handwritten notes indicate
18  that Plaintiff complained of crying spells, lack of energy, and
19  trouble sleeping.  (AR 356).   Dr. Isidro noted that Plaintiff
20  suffered from major depression.  (AR 357).   Dr. Isidro concluded
21  that Plaintiff should "restart" Cymbalta and continue with
22  psychotherapy.  (AR 357).

23

24      Plaintiff cancelled an appointment with Dr. Isidro on April
25  2, 2013 and left before being seen on April 23, 2013.  (AR 355).
26  On May 21, 2013, Plaintiff was again examined by Dr. Isidro and
27  reported that she wasn't "cry[ing] every day anymore."  (AR 355).

28

**B.   Examining, Non-Treating Doctors' Opinions**

    **1.   Independent Medical Evaluation – Physical Medicine**

       a. Jorge Minor, M.D.

On June 3, 2013, Dr. Minor, a physical medicine and pain specialist, interviewed and examined Plaintiff. (AR 433-53). During her interview, Plaintiff described her pain as "moderate most of the time," and that her typing ability had been "moderately change[d]" due to her current physical issues. (AR 436, 437). Upon examination, Dr. Minor found that Plaintiff's motor strength was "5/5" on all of her upper and lower extremities. (AR 447). Dr. Minor diagnosed Plaintiff with eleven conditions including major depression, postpartum depression, eating disorder, morbid obesity, history of knee contusion and non-compliance with medical care. (AR 451). Responding to the question of whether his examination would support a finding that Plaintiff would be considered disabled solely due to physical conditions, Dr. Minor responded:

> Because of [Plaintiff's] noncompliant [sic] with
> following through with medical recommendations such as
> dietary changes, weight loss, and compliance [sic] with
> physical therapy treatments that were recommended, it is
> difficulty [sic] to make changes or improvement from a
> functional and physical standpoint. [Plaintiff's]
> husband is not working and therefore there is [sic]

1    secondary gain[4] characteristics involved with her not
2    returning to work.

3

4    (AR 451).   Dr. Minor noted that Plaintiff's work capacity was
5    ongoing at a "sedentary level" but that her depression was a
6    contributing factor.  (AR 452).   Dr. Minor opined that "Maria's
7    prognosis is poor.  The time line in return to work would have
8    been on December 1, 2011 but Maria has a poor adjustment to
9    disability and is non-compliant with her medical care such as with
10   the Diabetes Mellitus and Physical Therapy." (AR 452).   Dr. Minor
11   opined that utilizing a "sub-rosa" to view Plaintiff in her
12   community would be useful in determining her level of disability.
13   (AR 452).

14

15        b.   Mark Wellisch, M.D.

16

17     On September 9, 2013, Dr. Wellisch performed a "complete
18   orthopedic consultation" on Plaintiff per the request of the
19   Agency.  (AR 377-390).  Dr. Wellisch noted a slow gait, but nothing
20   unusual in her gait or her ability to squat, rise and get on or
21   off the examining table.  (AR 378-79).  Dr. Wellisch noted some
22   tenderness in her lumbar spine.  (AR 379).  Plaintiff's range of
23   motion in her fingers was "full and painless." (AR 380).  Dr.
24   Wellisch then diagnosed Plaintiff as having lower back pain, knee
25   pain, and morbid obesity.  (AR 381).  Dr. Wellisch noted zero

26

27   ────────────────
     [4] Secondary gain is the advantage which can be gained secondary to
     stated or real illness.  "The Pursuit of Illness for Secondary
28   Gain" available at http://www.ncbi.nlm.nih.gov/pubmed/10172109

8

1   impairment in Plaintiff's fine fingering manipulation and that she
2   was able to walk and stand for four hours out of an eight-hour
3   day.  (AR 382).

4

5       **2.  Mental Health Evaluation**

6

7           a.  Jerome H. Franklin, MD

8

9       On May 29, 2013, Dr. Franklin completed a "complex psychiatric
10  evaluation" of Plaintiff.  (AR 413-33).  Upon arriving at Dr.
11  Franklin's office, Plaintiff "almost immediately began crying"
12  which continued for "at least an hour."  (AR 418).  Plaintiff
13  apologized for the crying spell, and stated that she "did not know
14  what caused" it.  (AR 418).  Other than Plaintiff's crying, Dr.
15  Franklin noted that she did not appear significantly depressed.
16  (AR 418).  Dr. Franklin assigned Plaintiff a Global Assessment of
17  Function ("GAF") score of 60[5].  (AR 429).

18

19      Dr. Franklin was optimistic about Plaintiff's ability to
20  return to work "once her crying spells are brought under control."
21  (AR 429).  Dr. Franklin opined that her crying spells could
22  preclude her from any type of employment as no employer would "put
23  up with this behavior even for a short period of time."  (AR 430).
24  Dr. Franklin then noted that Plaintiff "seems quite intelligent"

25

26  [5] The GAF scale is a scale from 0 to 100 where higher scores
    indicate greater levels of functioning.  A score between 51 and 60
27  indicate moderate symptoms of mental illness.  "What Does GAF Stand
    For?"  available at  https://www.mentalhelp.net/advice/what-does-
28  gaf-stand-for/

1    and would be able to perform complex work tasks if she were able

2    to control her crying spells.  (AR 430).  Dr. Franklin opined that

3    it was "completely feasible" that Plaintiff could return to work

4    within three to six months of his evaluation.  (AR 431).

5

6        Following his evaluation of Plaintiff, Dr. Franklin completed

7    a report in which he rated Plaintiff's current impairments.  (AR

8    409).  Dr. Franklin noted "[n]o [i]mpairment" as to Plaintiff's

9    concentration, persistence and pace; "[m]ild [i]mpairment" as to

10   Plaintiff's adaptation to stressful conditions, and; "[m]oderate

11   [i]mpairment" as to Plaintiff's daily activities and social

12   functioning.  (AR 409).  Dr. Franklin noted that Plaintiff's

13   condition was "improving" with medication, that her pain symptoms

14   were "vague" and that her motivation was "questionable." (AR 409).

15

16           b.  Lou Ellen Sherrill, Ph.D.

17

18       On September 9, 2013, Dr. Sherrill performed a psychological

19   evaluation of Plaintiff on behalf of the Agency.  (AR 369-76).

20   Plaintiff noted that she had been feeling extremely emotional and

21   had cried on the way to the evaluation.  (AR 369).  Plaintiff also

22   reported avoiding relationships "with all types of contacts and

23   people." (AR 370).  Plaintiff claimed that she was able to perform

24   all basic household chores unassisted, go shopping and cook for

25   her family.  (AR 371).

26

27       Dr. Sherrill's examination of Plaintiff revealed no problems

28   with speech, attention, concentration, mood, affect, insight or

10

1  judgment.   (AR 371).   Dr. Sherrill concluded that Plaintiff's

2  condition was not severe enough to be disabling as Plaintiff had

3  adequate "intelligence, memory and emotional stability in order to

4  participate in the workforce." (AR 373).  Dr. Sherrill noted that

5  Plaintiff would have "mild difficulty" in handling work pressures

6  and dealing with others in the workplace, but otherwise would be

7  a satisfactorily capable employee.   (AR 373).

8

9  **C.   Vocational Expert's Testimony**

10

11      Vocational Expert ("VE") Harmon Roman testified at Plaintiff's

12  hearing regarding the existence of jobs in the national economy

13  that Plaintiff could perform given her physical limitations.  (AR

14  70-75).   The ALJ posed a hypothetical based on a finding that a

15  plaintiff had a "marked limitation" in her ability to: relate and

16  interact with supervisors; deal with the public; maintain

17  concentration and attention for at least two hour increments and;

18  withstand the stress and pressure of an eight-hour workday.  (AR

19  74-75).  This hypothetical mirrored Dr. Simonds' findings mentioned

20  above.   (See AR 359).   The VE responded that these limitations

21  would preclude Plaintiff from returning to her past work or the

22  ability to do any type of work whatsoever.   (AR 75).

23

24  **D.   Plaintiff's Testimony**

25

26      During the August 8, 2013 hearing, Plaintiff testified that

27  her disability began in April of 2011.   (AR 50).   Plaintiff

28  testified that she worked as an insurance billing specialist, a

11

1   Medi-Cal specialist, a school administrator, a schoolyard
2   supervisor, and a typist. (AR 50-55). Plaintiff testified that
3   after she gave birth to her youngest child in February 2011, she
4   was unable to return to work due to mental and physical ailments.
5   (AR 57). Plaintiff testified that her primary care physician
6   diagnosed her with postpartum depression and prescribed her
7   antidepressants. (AR 57). Plaintiff claimed that her depression
8   then worsened and that she found it difficult to leave the house.
9   (AR 57-58).

10

11   Plaintiff testified that she then began seeing a psychiatrist
12   who changed her medication and that she has subsequently felt
13   better. (AR 58). Plaintiff contends, however, that she still
14   suffers from anxiety when in groups of people like at a grocery
15   store. (AR 58). She also expressed concern that she could not
16   perform job tasks the same way that she used to due to her anxiety
17   and crying spells. (AR 61). Plaintiff then testified that her
18   anxiety had "gotten worse in the last year" and that she has become
19   so anxious that she began sending her sons to do her grocery
20   shopping. (AR 62).

21

22   Plaintiff then testified as to her physical condition. (AR
23   64-70). She claimed that her diabetes had gotten worse and that
24   she asked her sister to move in with her to help her manage the
25   house and her young son. (AR 64). Plaintiff then testified that
26   she has had "[m]any falls" due to a cyst in her right knee and that
27   she usually walks while holding onto something or someone. (AR
28   65). Plaintiff then testified that she lacks the confidence to be

active and thus lose weight which she concedes "could be" contributing to her symptoms. (AR 67). Plaintiff then described her inability to complete simple tasks like doing laundry or bringing her child outside to play in the yard. (AR 68). She testified that she is unable to mop because it requires bending over, and that laundry baskets were too heavy for her to carry. (AR 68).

Plaintiff's attorney then questioned Plaintiff. (AR 69-70). Plaintiff testified that she does not sleep well which leaves her agitated and upset. (AR 69). She then claimed that she does not go to parties because the people there make her anxious which leads to crying spells. (AR 69). Plaintiff testified that she has trouble concentrating and remembering to finish what she started. (AR 69-70).

## IV.

### THE FIVE STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

_Tackett v. Apfel_, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

> (1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> (2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.
>
> (3)  Does the claimant's impairment meet or equal one on the list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.
>
> (4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled. If not, proceed to step five.
>
> (5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

_Tackett_, 180 F.3d at 1098-99; _see also_ _Bustamante v. Massanari_, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing _Tackett_); 20 C.F.R. §§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from April 1, 2011, through the date of the ALJ's decision on December 13, 2013. (AR 20-25). At step one, the ALJ observed that Plaintiff had not engaged in substantial gainful activity since the alleged onset of Plaintiff's disability. (AR 43). At step two, the ALJ found that Plaintiff had the determinable impairments of diabetes mellitus, obesity, popliteal cyst of the right knee, hypertension, depression, anxiety and borderline intellectual functioning. (AR 21). The ALJ found these impairments, in combination, "severe." (AR 21).

At step three, the ALJ found that the severe impairment at step two did not meet or medically equal a listed impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (AR 22). The ALJ considered several physical and mental listings and determined none of Plaintiff's impairments were the medical equivalent of any listed impairment. (AR 22).

At step four, the ALJ found that Plaintiff possessed the RFC to "perform light work as defined in 20 CFR 416.967(b), except she can lift/carry up to 20 pounds occasionally and 10 pounds frequently, stand/walk 4 hours, sit 6 hours with occasional work at unprotected heights." (AR 22). Given this RFC, the ALJ

1   determined that Plaintiff is capable of performing past relevant

2   work as a typist, [6] DOT # 203.582-066. (AR 24). In reaching this

3   conclusion, the ALJ stated that he had considered all of

4   Plaintiff's symptoms and the extent to which these symptoms could

5   reasonably be accepted as consistent with the objective medical

6   evidence and other evidence, based on the requirements of 20 CFR

7   404.1529 and SSRs 96-4b and 96-7p. (AR 22). The ALJ also

8   considered evidence in accordance with the requirements of CFR

9   404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (AR 22).

10

11      In considering Plaintiff's symptoms, the ALJ first determined

12   whether there were underlying medically determinable physical

13   impairments that could be reasonably expected to produce

14   Plaintiff's pain or other symptoms. (AR 22-23). The ALJ then

15   evaluated the intensity, persistence and limiting effects of

16   Plaintiff's symptoms to determine the extent to which they limited

17   Plaintiff's functioning. (AR 23). Because the ALJ determined that

18   Plaintiff's statements about the intensity, persistence, or

19   functionally limiting effects of her pain or other symptoms were

20   not substantiated by objective medical evidence, the ALJ made a

21   finding on the credibility of the statements based on consideration

22   of the entire case record. (AR 23).

23

24      The ALJ determined that Plaintiff's statements concerning the

25   intensity, persistence and limiting effects of her symptoms were

26   not entirely credible based upon the medical opinions of Drs.

27   Sherrill and Wellisch, Agency medical consultants. (AR 23; See

28   _____

[6] DICTIONARY OF OCCUPATIONAL TITLES #203.582-066 (4th ed. Revised 1991).

16

1   87-94, 369-76, 377-89).  The ALJ also based his credibility

2   determination on the "sporadic nature of treatment sought/obtained"

3   by Plaintiff.  (AR 23).  The ALJ also noted Plaintiff's "positive

4   response to treatment" as a reason for discounting her credibility.

5   (AR 23).  The ALJ's final reason for finding Plaintiff's statements

6   not entirely credible is based upon Plaintiff and her sister's

7   reports describing normal activities of daily living and social

8   functioning.  (AR 23).

9

10      In determining the severity of Plaintiff's physical condition,

11  the ALJ adopted the assessment of Dr. Wellisch.  (AR 24; See 377-

12  89).  In determining the severity of Plaintiff's mental condition,

13  the ALJ adopted the opinion of Dr. Sherrill.  (AR 24; See 369-76).

14  The ALJ gave less weight to the opinion of Dr. Simonds who had

15  indicated that Plaintiff would have marked limitations in

16  attention, concentration, dealing with others and handling the

17  stress of a workday.  (AR 24; See 358-59).  The ALJ's reason for

18  devaluing Dr. Simonds' assessment was due to Plaintiff's

19  improvement which occurred after Dr. Simonds' report was written.

20  (AR 24).

21

22      Finally, the ALJ concluded that Plaintiff would be capable of

23  performing her past work as a typist, as that work is generally

24  performed in the national economy.  (AR 25).  Accordingly, the ALJ

25  found that Plaintiff was not disabled at any time from the date of

26  her application.  (AR 25).

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F. 3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Auckland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VI.

DISCUSSION

Plaintiff contends that ALJ erred in three ways: 1) the ALJ erred in rejecting Plaintiff's credibility;[7] 2) the ALJ erred in failing to give appropriate weight to the treating and examining physicians, and; 3) The ALJ erred in finding that Plaintiff can return to her past relevant work as a typist.  (Memorandum in Support of Complaint ("MSC"), Dkt. No. 17, at 4-9, 9-13, 13-14). The Court agrees with the latter two of these contentions. Accordingly, for the reasons discussed below, the Court finds that the ALJ's decision must be REVERSED.

**A. The ALJ Erred By Failing To Give Appropriate Weight to The Treating Physicians' Opinions**

The ALJ adopted the evaluation of consultative psychologist Dr. Sherrill in determining the severity of Plaintiff's mental impairments.  (AR 24).  Dr. Sherrill concluded that: 1) Plaintiff was able perform simple tasks with minimal supervision; 2) Plaintiff was able to understand and carry out moderately complex verbal instructions; 3) Plaintiff would have only mild social and interpersonal issues in the workplace, and 4) Plaintiff's condition is "not severe enough to be considered disabling."  (AR 373).  The

---

[7] Plaintiff contends that the ALJ erred in failing to specifically identify "what testimony is not credible and what evidence undermines [Plaintiff's] complaints."  (MSC 5)  See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007).  The Court declines to reach this claim because it is unnecessary, as the Court remands on the two remaining grounds.

ALJ explicitly gave less weight to the opinion of Dr. Simonds, Plaintiff's treating physician. (AR 24). The ALJ states that he gave Dr. Simonds' opinion less weight because Dr. Sherrill performed "testing" and because Dr. Simonds' "completed the form only after the first visit." (AR 24). The ALJ also referenced a "check-box" form in which Dr. Simonds indicated Plaintiff's limitations as "markedly limited" and "moderately limited" in several workplace functions. (AR 24; see 359). Plaintiff contends that the ALJ erred by not giving the appropriate weight to Plaintiff's treating physician's opinion and failing to provide legitimate reasons to reject the opinion. (MSC 11-13). The Court agrees.

If a treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record for doing so. Lester, 81 F.3d at 830. The ALJ's stated reason for giving less weight to the opinion of Dr. Simonds is that he, unlike Dr. Sherrill, did not base his opinion on "testing" of Plaintiff, and that Dr. Simonds issued his opinion after only one visit by Plaintiff. (AR 24). With regard to testing, the Court finds that the mere fact that the consultative psychologist administered tests to Plaintiff, without more explanation, is not a sufficient basis to reject a treating doctor's evaluation of Plaintiff. The ALJ failed to identify what aspect of the testing provided grounds to reject the treating doctor's opinion. In addition, an ALJ is required to give weight

1   not only to the clinical findings of a treating physician, but also

2   his subjective judgments.

3

4        With regard to ALJ's finding that Dr. Simonds issued his

5   opinion after "only one visit" with Plaintiff, it is notable that

6   Dr. Sherrill also issued her opinion after only one meeting with

7   Plaintiff.[8] (See 359, 369-76).  In addition, Plaintiff's treating

8   physician issued his opinion after Plaintiff had previously seen a

9   social worker in the same medical group on multiple occasions, and

10  the social worker rendered findings similar to those articulated

11  by Dr. Simonds.  (AR 336).  The social worker had at least four

12  separate sessions with Plaintiff (AR 337-349) and each time made

13  findings that support Dr. Simonds' opinion, which the ALJ did not

14  address.  Moreover, Dr. Simonds performed a lengthy examination of

15  Plaintiff before rendering his opinion, and reviewed Plaintiff's

16  history.   The ALJ's reasons for rejecting Dr. Simonds' opinion

17  were therefore not legitimate and do not reflect a complete

18  consideration of the administrative record.

19

20       In the Memorandum in Support of Defendant's Answer ("MSA"),

21  Defendant argued that Dr. Simonds' opinion was "conclusory" with

22  "no supporting reasoning or clinical findings" to support it.  (MSA

23  11).  The Ninth Circuit has held that an ALJ may properly reject a

24  treating doctor's opinion if it is "conclusory, brief, and

25

26  [8] Dr. Sherrill's evaluation of Plaintiff was notably lacking a
    diagnosis of any type of depression.  This is notable as all of
27  Plaintiff's treating physicians have diagnosed her with varying
    degrees of depression.  (Compare AR 373 and 244, 247, 275, 303,
28  319, 326, 331, 335, 339, 341, 347, 352).

1   unsupported by the record as a whole." <u>Baston v. Comm'r of Soc.</u>
2   <u>Sec. Admin.</u>, 359 F.3d 1190 (9th Cir. 2004).   While one of Dr.
3   Simonds' documents in the record, viewed in isolation, appears to
4   be a "check-off report" without "any explanation of the bases of
5   [his] conclusions," the entire record <u>does</u>, in fact, contain a more
6   detailed explanation.

7

8        Although Dr. Simonds completed a check-off report, his report
9   was based upon a prior more detailed psychological evaluation of
10  Plaintiff.   (<u>See</u> AR 328-32).   In his more detailed evaluation of
11  Plaintiff, Dr. Simonds noted that Plaintiff cried a lot, had a
12  constricted affect, dysthymic mood and diagnosed Plaintiff with
13  severe depression.   (AR 331).   Dr. Simonds reviewed Plaintiff's
14  medical treatment (AR 329) and medication history.   (<u>Id.</u>).   This
15  Court finds that Dr. Simonds' evaluation of Plaintiff provided
16  ample explanation for the opinions expressed in the corresponding
17  check-off report.   (<u>See</u> 328-32, 359).

18

19       Plaintiff also contends that the ALJ erred by not mentioning
20  her other treating psychological source, Dr. Isidro, in his
21  decision.   (MSC 12).   In Defendant's answer, Defendant states that
22  the opinion of Dr. Isidro was not evaluated because "the check-
23  the-box form submitted by the doctor was conclusory and provided
24  no supporting reasoning or clinical findings."   <u>See</u> <u>Crane</u>, 76 F.3d
25  at 253; (MSA 6); (<u>see</u> AR 291).   Defendant concludes that even if
26  the ALJ erred in not addressing Dr. Isidro's opinion, the error
27  was harmless because it would not have altered the ALJ's decision
28  because Dr. Isidro's report was "completely unsupported by any

medical evidence." (MSA 6). As noted above, the check-box report cannot be viewed in isolation. The record, including the doctor's notes, demonstrates that the check-box form was preceded by Dr. Isidro's multiple meetings with Plaintiff as well as his in-depth psychological evaluation of her. (See AR 355-57). Dr. Isidro noted Plaintiff's psychological history, her current ailments, and her current medication. Dr. Isidro then diagnosed Plaintiff with "major depression," "post-partum depression," and treated Plaintiff by prescribing additional medication. (AR 357).

Given that Dr. Isidro's treating notes constitute evidence which supports the opinions expressed in the check-box form, the ALJ has thus failed to advance any "specific and legitimate" reasons for rejecting Dr. Isidro's opinion. See Lester, 81 F.3d at 830; (AR 291, 356-57). Because the ALJ failed to provide legitimate reasons for rejecting two treating doctors' opinions, remand is required.

### B. The ALJ Erred By Finding That Plaintiff Can Return To Her Past Relevant Work

During step four of the five-step sequential process the plaintiff carries the burden of proving that she cannot return to a position similar to her past work as it is generally performed. Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001). However, the ALJ must make a threshold determination as to the claimant's residual function. This determination is not a medical opinion but instead an administrative finding reached after consideration

1   of all the relevant evidence, including the diagnoses, treatment,

2   observations, medical records, and the Plaintiff's own subjective

3   symptoms.   See Social Security Ruling 96-5p; 20 C.F.R. § 404.1527

4   (e)(2) (stating that a residual functional capacity finding is not

5   a medical opinion but an administrative finding that is reserved

6   to the Commissioner).   The residual functional capacity is what a

7   claimant can still do despite existing exertional and nonexertional

8   limitations.    See 20 C.F.R. § 404.1545(a)(1).    Once the ALJ

9   determines the claimant's residual functional capacity, he then

10  compares these limitations with the job duties of the claimant's

11  previous work.

12

13      Here, the ALJ found that Plaintiff has the RFC to perform

14  light work and that she can "understand, remember, and carry out

15  at least simple and moderately complex, or simple to semi-skilled,

16  work without difficulty."   (AR 22).   The ALJ based his RFC

17  determination, from a mental health standpoint, on the opinion of

18  consultative psychologist Dr. Sherrill.   (AR 22-24); (see AR 373).

19  Dr. Sherrill found that Plaintiff could perform "simple and

20  repetitive" tasks with appropriate pace and persistence throughout

21  a normal workday, and would only have mild difficulty dealing with

22  work pressures and coworkers.   (AR 373).   This finding informed

23  the ALJ's determination that Plaintiff could return to her past

24  work as a typist.   (AR 24).

25

26      Dr. Sherrill's assessment is contradicted by opinions of

27  Plaintiff's treating physicians, Drs. Isidro and Simonds.  Dr.

28  Isidro determined that Plaintiff had "marke[d]" limitations in her

ability to interact with coworkers, and her ability to withstand the pressures of an eight-hour workday, amongst other "moderate" limitations. (See 291). Dr. Simonds also determined that Plaintiff had "[m]arked" limitations in her ability to interact with coworkers, and her ability to withstand the pressures of an eight-hour workday, amongst other "moderate" limitations. (AR 359). In addition, Dr. Simonds assessed "[m]arked" limitations in Plaintiff's ability to deal with the public, and her ability to maintain concentration for two-hour increments. In fact, the VE testified that limitations identical to those expressed by Dr. Simonds would eliminate all work options available to Plaintiff. (AR 74-75; see 359). This evidence refutes the ALJ's finding that Plaintiff is able to return to her past work as a typist on a full-time basis. As the ALJ failed to provide legitimate reasons to reject the treating physicians' opinions, the RFC and finding that Plaintiff can return to her past relevant work must be reevaluated on remand.

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this matter for further proceedings consistent with this decision. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 5, 2016

/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**

26